AMERICAN MARITIME
ASSOCIATION, et al.

v.

UNITED STATES of America, et al.

Aeron Marine Shipping Company, et
al., Appellants.

AMERICAN MARITIME ASSOCIATION
Phoenix Bulkship I, Inc., et al.,
Appellants,

v.

UNITED STATES of America, et al.

AMERICAN MARITIME ASSOCIATION,
Appellant, Phoenix Bulkship I,
Inc., et al.,

v.

UNITED STATES of America, et al.

Nos. 84–5381, 84–5502 and 84–5503.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 1985.

Decided July 2, 1985.

Michael Joseph, Washington, D.C., with whom Mark P. Schlefer, Thomas L. Mills and Timothy Trushel, Washington, D.C., were on the brief, for Aeron Marine Shipping Co., et al., appellants in No. 84–5381 and appellees in Nos. 84–5502 and 84–5503.

Joseph A. Klausner, Washington, D.C., with whom Allan A. Tuttle and Ralph G. Steinhardt, III, Washington, D.C., were on the brief, for American Maritime Ass'n, appellee in Nos. 84–5381 and 84–5502 and appellant in No. 84–5503. Michael D. Esch, Washington, D.C., entered an appearance for American Maritime Ass'n in Nos. 84–5381, 84–5502 and 84–5503.

Anne E. Mickey, Washington, D.C., with whom Jeffrey R. Masi, Washington, D.C., was on the brief, for Phoenix Bulkship I, Inc., et al., appellees in Nos. 84–5381 and 84–5503 and appellants in No. 84–5502.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., and James F. Ford, Counsel, Dept. of Justice, Washington, D.C., were on the brief, for the United States of America, et al., appellees in Nos. 84–5381, 84–5502 and 84–5503.

Before WALD, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The various appeals and cross-appeals in these consolidated cases constitute the latest round in the efforts of the Maritime Subsidy Board (the Board) and the Maritime Administration (MarAd) of the Department of Transportation to implement Congress' 1970 amendments to the Merchant Marine Act, 46 U.S.C. §§ 1101–1295g (the Act). Those amendments provided direct subsidies to certain U.S.-flag bulk vessels and envisioned that such "subsidized" vessels would carry foreign bulk preference cargoes at low world rates as the existing service provided by "unsubsidized" shippers became inadequate.[1] In 1978, the Board concluded that existing service in the preference trade was inadequate and determined that two of the seven subsidized bulk vessels operated by the Aeron Marine Shipping Company (Aeron) should be allowed to bid on preference cargo contracts. In *Aeron Marine Shipping Co. v. United States*, 695 F.2d 567 (D.C.Cir.1982), this court concluded that the Board must admit all of Aeron's subsidized vessels into the preference trade given its finding that existing service was inadequate by an amount greater than the capacity of all seven Aeron ships. We further directed the Board to reconsider the appropriate rate structure for those ships.

While *Aeron* was under submission to this court, the American Maritime Association (AMA), which represents unsubsidized shippers in competition with Aeron for preference cargo contracts, and Phoenix Bulkship I, Inc. (Phoenix), an individual unsubsidized carrier, petitioned the Board to reconsider its 1978 inadequacy finding in light of intervening changes in the shipping industry. On remand from *Aeron*, the Board concluded that our decision precluded any reconsideration of its 1978 adequacy finding and, through several orders and a rulemaking, established a complex regulatory structure for Aeron's carriage of bulk preference cargo. Although the Board de-

---

1. The term "subsidized" carriers refers to those shippers who receive direct government subsidies. The term "unsubsidized" carriers is technically a misnomer: it refers to shippers who receive indirect government subsidies. *See infra* pp. 548–549.

cided to allow Aeron to bid for preference cargoes at relatively high cost-based rates, it adopted a rule requiring government shipper agencies to account for Aeron's subsidies when evaluating its bids for such cargoes (the bid augmentation rule). The Board also determined that Aeron must forgo a portion of its government subsidy if it derives more than half of its annual gross revenues from preference cargo carriage (the subsidy abatement scheme).

The AMA, Phoenix and Aeron each sought review in district court. While the district court upheld the rate decision and the subsidy abatement scheme, it concluded that the Board had erroneously read our mandate in *Aeron* to bar any further consideration of its 1978 adequacy finding. It therefore remanded to the Board for a determination of whether that adequacy proceeding should be reopened. Both Aeron and the unsubsidized shippers have appealed various aspects of the district court's order. We now affirm the district court's ruling that the Board must determine whether to reconsider the adequacy finding and its conclusion that the Board's rate decision constitutes a reasonable accommodation of the conflicting policies committed to the agency's care by statute. Although we also believe that a subsidy abatement scheme is authorized by the Act, we conclude that the Board failed to offer an adequate explanation for the particular abatement formula it adopted for bulk vessels. We therefore reverse the district court on this single issue and instruct the court to remand to the Board for further proceedings consistent with this opinion.

## I. The Background

### A. *The Statutory and Regulatory Framework*

This dispute involves the interaction of several provisions of the Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985 (codified as amended at 46 U.S.C. §§ 1101–1295g),

its 1970 amendments, Merchant Marine Act of 1970, Pub.L. No. 91–469, 84 Stat. 1018 (codified at scattered sections in 46 U.S.C.), and various acts which establish preferences for U.S.-flag ship carriage of certain cargo. *See Aeron*, 695 F.2d at 569–70; *Aeron Marine Shipping Co. v. United States*, 525 F.Supp. 527, 531–33 (D.D.C. 1981). Congress enacted these statutes to create a strong domestic merchant marine capable of competing with foreign carriers in the world market, and each act recognizes that foreign subsidies and high domestic labor costs place American-built and American-operated ships at a competitive disadvantage with foreign vessels in the absence of government assistance. *See, e.g.,* S.Rep. No. 1721, 74th Cong., 2d Sess. 4–5 (1936).

The 1936 Act established an elaborate system of merchant marine subsidies, two aspects of which are relevant here. First, the Act provided for both operating differential subsidies (ODS) and construction differential subsidies (CDS) for U.S.-flag liner vessels in an attempt to offset the lower operating and construction costs enjoyed by foreign liner operators. *See* Merchant Marine Act of 1936, §§ 601–606 (codified as amended at 46 U.S.C. §§ 1171–76) (ODS); *id.* §§ 501–511 (codified as amended at 46 U.S.C. §§ 1151–1161) (CDS). The 1936 Act, however, did not establish a comparable direct subsidy program for bulk carriage vessels.[2] Instead, Congress has from time to time extended indirect subsidies to U.S.-flag bulk vessels by reserving certain cargoes, called preference cargoes, for those ships and by allowing domestic bulk operators to bid for preference cargoes at rates well above world rates. In particular, the Cargo Preference Act of 1954, ch. 936, 68 Stat. 832 (codified at section 901 of the Act, 46 U.S.C. § 1241), requires government agencies to contract with domestic ships to carry at least half of all government-sponsored cargoes destined for foreign ports as

---

**2.** Bulk vessels are chartered for specific voyages and carry large (usually shipload size) shipments under contract. Liner vessels, by contrast, operate as common carriers, travel on a

regular schedule along designated trade routes, and typically carry an assortment of small shipments. *See Aeron*, 695 F.2d at 569–70 n. 3.

long as those vessels are "available at fair and reasonable rates for United States-flag commercial vessels." 46 U.S.C. 1241(b)(1).[3] Such rates, called premium rates, constitute the maximum allowable charges for a particular ship's carriage of preference cargo and allow unsubsidized bulk vessels to bid for contracts at rates equivalent to the actual costs incurred on a particular voyage plus a reasonable profit. *See Payment of Subsidy for Carriage of Preference Cargoes,* 13 Ship.Reg.Rep. (P & F) 44 (M.S.B.1972). In practice, premium rates can amount to more than twice the world rates charged by foreign-flag carriers in the worldwide commercial market. *See* H.R.Rep. No. 1073, 91st Cong., 2d Sess. 26 (1970), U.S.Code Cong. & Admin.News p. 4188 [hereinafter *House Report*]; *Aeron,* 695 F.2d at 569. The ability of unsubsidized bulk shippers to carry preference cargoes at premium rates thus provided those operators with a substantial and costly indirect government subsidy.

This combination of direct subsidies for liner vessels and premium rates for otherwise unsubsidized bulk ships did not encourage the construction of a competitive U.S.-flag merchant marine. In 1936, liner vessels conducted most foreign shipping. By 1970, however, the majority of foreign commercial commerce was carried by bulk carriers, and efficient U.S.-flag bulk vessels, not liner vessels, were thus needed to compete in the world market. *See House Report* at 38; 116 Cong.Rec. 32,511 (1970) (statement of Sen. Griffin). At that time, Congress recognized that the premium rate structure had failed to induce the construction of U.S.-flag bulk vessels capable of

competing in the world market, *see House Report* at 121, and that the existing, World War II vintage bulk ships could only turn a profit by carrying non-commercial preference cargoes at premium rates, *see id.* at 38; 116 Cong.Rec. 16,607 (1970) (statement of Rep.Dent). Faced with these disappointing results, Congress amended the Act in 1970 to extend direct subsidies—ODS and CDS—to domestic bulk vessels. *See* Merchant Marine Act of 1970, Pub.L. No. 91–469, § 14, 84 Stat. 1018, 1023 (amending 46 U.S.C. § 1171(a)).[4]

Congress clearly intended the 1970 amendments both to encourage the construction of efficient domestic bulk vessels capable of competing with foreign commercial carriers in the world market and, *gradually,* to phase out the expensive and ineffective system of indirect subsidies paid to existing bulk shippers in the form of premium rates for preference cargo carriage. As Representative Dent stated in the debates over the 1970 amendments:

> The granting of direct operating subsidy to U.S.-flag bulk carriers as provided by the bill would have two principal advantages.
>
> First, the United States would have the potential of building a bulk carrier fleet in order to effectively compete with foreign vessels in carrying bulk commodities that constitute the predominant share of our foreign commerce. Such a fleet would insure that the commodities vital to our economy would be carried in times of emergency. Second, the United States would be substituting a direct subsidy for the indirect subsidy presently

---

3. Section 901 is the primary preference cargo provision and the only preference legislation involved in this case. Similarly, only foreign preference cargoes—cargoes carried from a domestic to a foreign port—are at issue here. Certain domestic cargoes—cargoes carried between two domestic ports—are also reserved for U.S.-flag vessels, *see* 46 U.S.C. § 883, but those cargoes cannot be carried by CDS-subsidized ships. *See* 46 U.S.C. § 1156; *cf. Independent U.S. Tanker Owners Comm. v. Lewis,* 690 F.2d 908, 911–12 (D.C.Cir.1982).

4. Although CDS was theoretically available for bulk vessels before 1970, MarAd had for the most part reserved the limited CDS funds for subsidized liner vessels. *See Aeron,* 695 F.2d at 570 n. 4. Congress clearly expected MarAd to extend CDS as well as ODS to qualified bulk carriers under the 1970 amendments. *See* President's Maritime Program, Part 2: Hearings Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries, 91st Cong., 2d Sess. 166–67 (1970) (statement of Maritime Administrator Andrew Gibson) [hereinafter *House Hearings II*].

paid through preference rates for government sponsored cargoes.

116 Cong.Rec. 16,608 (1970); *see also House Report* at 38; *Aeron*, 695 F.2d at 570. Congress envisioned that the domestic bulk carriers constructed with the aid of CDS and operated with the aid of ODS could profitably operate at world rates and, therefore, would eventually carry preference cargo at world rates as the existing unsubsidized bulk ships were retired from service. *See Aeron*, 695 F.2d at 570.[5] Congress also expected the substitution of direct for indirect subsidies to reduce substantially the government costs of preference cargo carriage.[6]

At the same time, however, Congress sought to protect investment in existing unsubsidized vessels by allowing subsidized vessels to enter the preference trade only if the Secretary determines that existing unsubsidized service in that trade is inadequate, *see* 46 U.S.C. § 1175(c), and by permitting the Secretary to give unsubsidized operators priority over subsidized carriers during a phase-in period of approximately five years, *see Aeron*, 695 F.2d at 570 & n. 9 (citing legislative history). Thus Congress did not expect that subsidized world-rate vessels would immediately displace unsubsidized premium-rate ships in the preference trade; instead, it forsaw a *"gradual* phase-out of the premium rates now being paid for preference cargoes as a system of direct subsidies was being substituted." S.Rep. 1080, 91st Cong., 2d Sess. 58 (1970), U.S.Code Cong. & Admin. News pp. 4188, 4232 (emphasis added); *see House Report* at 38; 116 Cong.Rec. 16,593 (1970) (statement of Rep. Mailliard); *House Hearings II* at 201, 640. Congress did assume, however, that the useful life of existing unsubsidized vessels was rapidly expiring [7] and that the availability of ODS and CDS for bulk ships would result in the immediate construction of new and efficient U.S.-flag bulk ships capable of competing at world rates in the worldwide commercial market. *See generally Aeron Marine Shipping Co.,* 19 Ship.Reg.Rep. (P & F) 111, 118–20 (M.S.B.1979) (discussing legislative history). In sum, it envisioned a relatively short transitional period during which the existing unsubsidized vessels would be retired from service and after which subsidized vessels would carry preference cargoes at world rates. *See, e.g., House Hearings II* at 640.

As a consequence, the 1970 amendments did not directly address the conditions under which subsidized vessels could bid against unsubsidized ships for preference cargoes. Instead, Congress left to MarAd and the Board the task of adjusting the

---

**5.** Another factor prompting the Administration to extend operating subsidy to U.S.-flag bulk carriers is the desire to phase out premium rates now paid for government sponsored cargoes carried on American-flag ships. The amounts covered by these premium rates are paid from several different appropriations and constitute, in effect, indirect subsidies. The aim of the Administration's program and the bill is to enable American bulk carriers, *eventually at least,* to carry government cargoes at world rates.

*House Report* at 38 (emphasis added).

**6.** As the Maritime Administrator explained:

The Department of Agriculture has spent $630 million over world market rates during the past 10 years for the transportation of preference cargo.... A system of direct subsidization of these ships, instead of the premium rate system, will result in savings totaling $480 million by 1982. In addition to these savings, modern productive bulk carriers will have been constructed.

President's Maritime Program, Part 1: Hearings Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries, 91st Cong., 1st Sess. 20–21 (1969) (quoted in *Aeron,* 695 F.2d at 570 n. 7); *see also* President's Message Transmitting Recommendation for New Shipbuilding Program, H.R. Doc. No. 183, 91st Cong., 1st Sess. 3–4 (1969). *See generally* Aeron Marine Shipping Co., 19 Ship. Reg. (P & F) 111, 113–120 (M.S.B.1979) (discussing the legislative history of the 1970 Amendments).

**7.** By 1970, only three percent of the existing unsubsidized U.S.-flag bulk fleet was less than 20 years old, and ninety percent was of World War II vintage. *See House Report* at 120. Congress and the administration thus contemplated that only a few unsubsidized bulk vessels would continue to bid for preference cargoes within several years of the 1970 amendments. *See id.;* 116 Cong.Rec. 32,510–11 (1970) (statement of Sen. Griffin); *Aeron,* 19 Ship.Reg.Rep. at 118–120.

preference cargo program in light of the 1970 amendments and the eventual goal of having subsidized ships carry preference cargoes at world rates. *See Aeron,* 19 Ship.Reg.Rep. at 120 (discussing legislative history). In particular, Congress amended section 901 of the Act, the cargo preference provision, to read as follows:

> Every department or agency having responsibility under this [cargo preference] subsection shall administer its programs with respect to this subsection under regulations issued by the Secretary of [Transportation]. The Secretary of [Transportation] shall review such administration and shall annually report to Congress with respect thereto.

84 Stat. at 1034 (codified at 46 U.S.C. 1241(b)(2)). Congress thus gave MarAd and the Board broad discretion to supervise the implementation of the 1970 amendments and, accordingly, to regulate the conditions under which subsidized shippers would be admitted to the preference trade. *See* S.Rep. No. 1080, 91st Cong., 2d Sess. 58–59 (1970); H.R.Rep. 1555, 91st Cong., 2d Sess. 6 (1970) (conference statement of House managers); *Aeron,* 525 F.Supp. at 542 n. 33.[8]

Unfortunately, Congress' assumptions concerning the ease of transition from an indirect to a direct subsidy program for bulk ships proved incorrect: direct subsidies did not encourage the immediate construction of new U.S.-flag bulk carriers in substantial numbers, and the existing unsubsidized vessels have remained in service and continue to bid on preference cargoes at premium rates. *See Aeron,* 19 Ship. Reg.Rep. at 120. Moreover, the bulk vessels eventually constructed under the direct subsidy program were not, as it turned out, fully competitive with foreign vessels in the worldwide commercial market and could not operate profitably at world rates.[9] The Secretary's attempt to implement the 1970 amendments in light of these essentially unforeseen events forms the basis of the present dispute.

### B. *The Proceedings in This Case*

The pre-1982 history of the Board's attempt to specify the conditions under which subsidized carriers can carry preference cargoes is amply described in our earlier opinion, *see Aeron,* 695 F.2d at 570–73, and need not be repeated in detail here. Briefly, Aeron, which was the first shipping concern to take advantage of CDS and ODS assistance for bulk vessels, petitioned the Board in 1978 to admit its seven subsidized ships into the preference trade.[10] Af-

---

**8.** As we found in *Aeron,* Congress also conferred broad discretion on the Board with respect to the ODS program as a whole in section 603(a) of the Act which provides that the Board

> may enter into a contract with the applicant for the payment of [ODS] ... subject to such reasonable terms and conditions, consistent with this [Act], as the Secretary of Transportation shall require to effectuate purposes and policy of this [Act].

46 U.S.C. § 1173(a); *see Aeron,* 695 F.2d at 575–77 (holding that the Board has authority to set preference cargo rates for subsidized bulk vessels under this section); *see also House Report* at 38–39 (noting the rate-setting discretion conferred on the Board); *cf.* S.Rep. No. 1080, 91st Cong., 2nd Sess. 58–59 (1970), U.S.Code & Admin.News p. 4188.

**9.** As the Board has noted:

> Two events after 1970 occurred in worldwide shipping that were not anticipated or fully appreciated during the consideration of the 1970 Act. The first was the spectacular rise in the price of fuel oil, begun in 1973/1974 and continuing. Because nearly all U.S.-flag bulk vessels are steam-driven whereas the principal foreign flag bulk vessels are diesel-driven, the U.S.-flag bulk operator incurs a substantial disadvantage in fuel cost beyond other operating cost differentials.... The disadvantage is particularly acute in spot markets, such as the preference trades. Second, a surprising number of bulk operators of World War II vintage tankers were able to survive until the Alaskan pipeline began flowing in 1977, thus prolonging the removal of such vessels from service. The Alaskan oil trade also had the effect of stimulating a limited amount of unsubsidized (non-CDS) tanker construction.

*Aeron,* 19 Ship.Reg.Rep. at 120 (footnote omitted); *see also Aeron,* 695 F.2d at 571 (noting that, as a result of the dramatic fuel increases between 1973 and 1974, ODS does not make U.S.-flag bulk carriers fully competitive with foreign operators).

**10.** Ownership of the seven vessels is divided among six commonly controlled corporations and partnerships, all of which are parties to this case. We use "Aeron" to refer collectively to all six entities.

ter holding the adequacy hearing required by section 605(c) of the Act, the Board found that the bulk preference trade was inadequately served by existing unsubsidized shippers and that it could accommodate all seven Aeron vessels.[11] *See Atlas Marine Co.*, 18 Ship.Reg.Rep. (P & F) 987, 1002–1010 (M.S.B.1978). The Board nonetheless admitted only two of Aeron's seven ships and only under the condition that they operate in the preference trade at world rates with a one-way fuel differential allowance. *See Aeron Marine Shipping Co.*, 19 Ship.Reg.Rep. (P & F) 491 (M.S.B. 1979). Aeron sought review of both the partial admission and the rate decision in district court; that court ordered the admission of all seven Aeron ships to the preference trade and upheld the rate structure. *See Aeron*, 527 F.Supp. at 547.

On appeal, we concluded that the Board's decision to admit only two of Aeron's ships was arbitrary in view of its inadequacy finding as to all seven vessels and therefore affirmed the order admitting the seven Aeron ships to the preference trade. *See Aeron*, 695 F.2d at 573–75. We also found that the Board had inadequately justified its rate decision given the evidence that Aeron could not profitably carry preference cargoes at world rates and thus would not be attracted to the preference trade under the Board's rate structure. We therefore directed the Board to reconsider its rate decision in light of the conflicting aims of the 1970 amendments.

> Congress intended subsidized ships to take over the preference trades; "unsubsidized," premium-rate ships were to be phased out. However, the Subsidy Board cannot compel subsidized ships to carry preference cargos; it must rely on

market incentives to make carrying these cargos attractive. If the rate set by the Board is too low, subsidized ships will not carry preference cargos. Such a rate would frustrate congressional policy. Instead of saving money by having efficient subsidized ships carry preference cargos, the government would continue to pay premium rates to unsubsidized ships and would also incur the extra cost of paying ODS to subsidized ships to carry non-preference cargos....

> Given the tension between Congress' dual objectives to have subsidized ships carry preference cargos and have subsidized ships carry those cargos at world rates, the Subsidy Board must strike a balance between the conflicting goals. It must seek to have subsidized ships carry preference cargos at rates that, so far as practicable, approach world rates. But it must also permit rates high enough to provide reasonable incentives for subsidized operators to carry those cargos.

*Id.* at 578–79 (footnotes omitted). We also noted that "it may well be that a rate resulting from [this] balancing process ... would be a rate 'directly influenced' by world rates." *Id.* at 579 n. 36.[12]

Before this court decided *Aeron*, the AMA petitioned the Board to reconsider its initial determination that existing U.S.-flag service in the preference trade was inadequate within the meaning of section 605(c) of the Act. The AMA contended that intervening changes in the shipping industry had cured whatever inadequacy in U.S.-flag service had existed in 1978 and that all of Aeron's ships must therefore be excluded from the preference trade. After we issued *Aeron*, the Board denied the AMA's

**11.** Section 605(c) proceedings are conducted on a ship by ship basis. When a subsidized vessel seeks to compete for preference cargo contracts, it petitions the Board for a finding that existing service is inadequate with respect to that ship, i.e., that total preference cargo demand exceeds existing service by an amount greater than the capacity of the petitioner's subsidized vessel. *See Aeron*, 527 F.Supp. at 536–37. In the prior proceedings in this case, then, the Board specifically found that existing U.S.-flag service in the preference trade was inadequate with respect to

Aeron's seven ships. *See Atlas Marine Co.*, 18 Ship.Reg.Rep. (P & F) 987, 1002–08 (M.S.B. 1978).

**12.** We also indicated that, if the Board decided to impose an unprofitable rate on remand, it was obliged to explain why the language and the legislative history of the Act justified the chosen rate. *See Aeron*, 695 F.2d at 582; *see also infra* pp. 558–559.

motion for reconsideration of the adequacy finding, eventually concluding that our opinion precluded any further section 605(c) proceedings by ordering the admission of all seven Aeron ships. *See Aeron Marine Shipping Co.*, 22 Ship.Reg.Rep. (P & F) 319, 323 (M.S.B.1983) [hereinafter *Tentative Order*]; *Aeron Marine Shipping Co.*, 22 Ship.Reg.Rep. (P & F) 599, 604–05 (M.S.B.1983) [hereinafter *Final Order*].

The post-remand history of the rate issue was somewhat more complicated. In its Tentative Order on remand, the Board concluded that, pursuant to section 901 of the Act, the "fair and reasonable" rate ceiling for Aeron's preference cargo bids should be set at cost-based or premium rates adjusted downward for ODS. *See Tentative Order*, 22 Ship.Reg.Rep. at 324. Specifically, the Board proposed to permit a subsidized vessel to bid for preference cargo contracts at rates based on its actual costs, not including those costs covered by ODS, plus a reasonable profit. The Board reasoned that allowing Aeron to bid at cost-based rates but adjusting those rates downward to reflect its receipt of ODS would both encourage Aeron to enter the preference trade and result in rates lower than the premium rates paid to unsubsidized ships. *See id.* In its comments on the Tentative Order, however, Phoenix argued that the proposed rate structure would, in some cases, allow relatively inefficient sub-sidized vessels to underbid unsubsidized ships unless government shipper agencies (which award individual preference cargo contracts) were required to take into account the amount of ODS Aeron would receive for the voyage at issue in evaluating Aeron's bid against those of unsubsidized operators. Phoenix also commented that the proposed rate structure would, in some instances, actually increase the total cost incurred by the government in preference cargo carriage by allowing Aeron to receive both the indirect subsidy of cost-based rates and the direct ODS subsidy.[13] Both results, Phoenix argued, contradicted the clear congressional intent behind the 1970 amendments.

The Administrator agreed and directed MarAd to prepare

a rule to require shipper agencies to consider total government cost for the U.S. flag vessel selected to carry the preference bulk cargo, when the shipper agency directly pays or finances the ocean transportation freight charges.

*Final Order*, 22 Ship.Reg.Rep. at 608. The resulting rule requires shipping agencies to "augment" bids for preference cargo contracts received from subsidized ships by an amount equal to the ODS which the vessel would receive for the voyage if awarded the contract. *See Cargo Preference*, 49 Fed.Reg. 2897, 2900 (Jan. 24, 1984)

**13.** MarAd offered the following example to illustrate Phoenix's challenge to the rate structure established in the Tentative Order. The example compares the bids of a subsidized and an unsubsidized vessel and assumes that the subsidized ship has higher actual costs. The agency evaluating the preference cargo bids is assumed to be the Department of Agriculture (USDA), which pays an operator the difference between U.S.-flag premium rates and word rates when it awards a preference cargo contract.

| Cost Per Ton of Cargo | Subsidized Vessel | Unsubsidized Vessel |
| --- | --- | --- |
| Premium rate guideline | $60 | $65 |
| Foreign flag rate | 25 | 25 |
| Cost to USDA | 35 | 40 |
| ODS | 20 | — |
| Total cost to government | 55 | 40 |

The premium rate guideline is calculated according to each ship's actual costs plus a reason-able profit and is the maximum allowable bid for each vessel. That guideline rate will be lower for the subsidized vessel, despite its higher actual costs, because the costs covered by ODS cannot be included in its cost base.

As the example indicates, if the USDA does not take ODS into account in comparing the bids, it would award the contract to the (relatively inefficient) subsidized vessel even though the total subsidy cost to the government is $55 per ton ($20 per ton ODS and $35 per ton premium) for subsidized carriage and only $40 per ton (all in premium) for unsubsidized carriage. *See Cargo Preference*, 49 Fed.Reg. 2897, 2899 (Jan. 24, 1984); *also Final Order*, 22 Ship.Reg.Rep. at 607 (noting a similar example offered by Phoenix). Phoenix argued that this result contradicted Congress' expectation that the 1970 amendments would lower the cost of preference cargo carriage.

[hereinafter *Interim Rulemaking*].[14] Mar-Ad reasoned that this bid augmentation rule reasonably accommodated the conflicting goals of the 1970 amendments by preserving incentives for Aeron to enter the preference trade while both protecting unsubsidized shippers from inequitable and unintended underbidding by Aeron and minimizing the total "subsidy" costs to the government. *See id.* at 2899.

The Board's post-remand orders also established a subsidy abatement scheme, initially unopposed by Aeron, which requires Aeron to forego a portion of its ODS if its subsidized vessels derive more than half of their total annual gross freight revenues from the preference trade. *See Tentative Order*, 22 Ship.Reg.Rep. at 325; *Final Order*, 22 Ship.Reg.Rep. at 608.[15] The Board derived the abatement scheme from section 601(a)(1) of the Act, which permits the award of ODS to a ship only if "the opera-

tion of such vessel ... is required to meet foreign-flag competition." 46 U.S.C. § 1171(a)(1). In administering ODS contracts for liner vessels, the Board has interpreted this provision to require reduced ODS payments if those vessels derive more than half of their revenues from the carriage of preference cargoes at premium rates, which, of course, is never subject to foreign-flag competition. *See generally States Marine Int'l, Inc. v. Peterson*, 518 F.2d 1070 (D.C.Cir.1975) (upholding the abatement rule applied to liner vessels), *cert. denied*, 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976). The Board applied its liner subsidy abatement rule to subsidized bulk vessels on the same theory. *See Tentative Order*, 22 Ship.Reg.Rep. at 323–24; *see also Aeron*, 695 F.2d at 579 n. 36 (noting that the Board had applied section 601(a)(1) to subsidized bulk vessels in its initial *Aeron* proceedings).[16]

**14.** MarAd initially issued this regulation in the form of an "Interim Final Rulemaking and Request for Comments" in order to allow Aeron to begin bidding on preference cargoes at cost-based rates in accordance with the bid augmentation rule. *See Interim Rulemaking*, 49 Fed. Reg. at 2899–900. The AMA immediately sought review of this interim rulemaking in district court. *See Union of Concerned Scientists v. Nuclear Regulatory Comm.*, 711 F.2d 370, 379 (D.C.Cir.1983) (allowing review of a similar interim rulemaking). MarAd issued a so-called "Final Rule" in October of 1984—after the district court had upheld the portion of the interim rule governing bid augmentation. *See Cargo Preference*, 49 Fed.Reg. 39,847 (Oct. 11, 1984) [hereinafter *Final Rulemaking*]. We take judicial notice of the fact that the final rule reaffirms the findings discussed in the interim rulemaking and basically adopts the interim rule's bid augmentation regulation. *See id.* at 39,847–50. Although aspects of this litigation could also be resolved in a petition to review the final rule, MarAd's issuance of that rule does not moot Aeron's and the unsubsidized shipper's challenges, which are equally applicable to the final rule and the interim rule. *See Concerned Scientists*, 711 F.2d at 377–79.

In the district court, the AMA argued that MarAd's interim rulemaking violated the notice and comment provision of the Administrative Procedure Act, *see* 5 U.S.C. § 553, because it was effective upon issuance. The AMA does not press this argument on appeal. In any event, we agree with the district court that MarAd found for "good cause" that pre-effectiveness public comment was impractical and unneces-

sary under the circumstances of this case, *see id.* § 553(b)(3)(B), in light of the pressing need to establish some procedure for evaluating Aeron's preference cargo bids. *See Interim Rulemaking*, 49 Fed.Reg. at 2899–900.

**15.** If a subsidized vessel derives more than half of its total annual gross revenues from the carriage of preference cargo, the subsidy abatement rule requires its ODS to be reduced by the following formula:

| Percent of annual gross freight revenue from carriage of competitive cargo per vessel | Percent of ODS reduction |
|---|---|
| 40 to 49.9 | 20 |
| 30 to 39.9 | 40 |
| 20 to 29.9 | 60 |
| 10 to 19.9 | 80 |
| 0 to 9.9 | 100 |

*Tentative Order*, 22 Ship.Reg.Rep. at 325; *see also* 46 C.F.R. § 280.4(b)(3) (1984).

**16.** As initially adopted, the interim bid augmentation rule failed to consider whether a subsidized vessel's ODS would eventually be repaid under the subsidy abatement scheme. In other words, the bid augmentation procedure required shipper agencies to augment a subsidized shipper's bid by the full amount of ODS available to that shipper even though the carrier would have to repay a portion of its total annual ODS at the end of the year if it derives more than half of its gross annual revenues from the preference trade. We note that the final rule adjusts for this possibility by requiring MarAd

The flurry of orders and rulemakings issued in response to our *Aeron* decision thus created the following conditions for Aeron's carriage of preference cargoes. All of Aeron's subsidized ships are permitted to bid for bulk preference cargo contracts. Upon the receipt of a bid by a subsidized vessel, the relevant government agency must request from MarAd the amount of ODS that the vessel will receive for the voyage at issue and derive an "augmented" bid by adding the ODS figure to the ship's bid. The agency must then determine the low bidder for the contract by comparing the bids of the unsubsidized shippers with the augmented bids of the subsidized operators. The agency will award the contract to the low bidder if its bid is at or below the "fair and reasonable," i.e., cost-based rate guideline for that vessel's carriage under the contract as determined by MarAd. The "fair and reasonable" rate guideline for a subsidized ship is based on its costs, net of ODS, plus a reasonable profit.[17] Finally, subsidized operators must repay a portion of their ODS if they receive more than half of their gross revenues from preference cargo contracts.

Phoenix, the AMA and Aeron each sought review of the Board's and MarAd's decisions in district court. Phoenix and the AMA argued that the Board had erroneously concluded that our opinion in *Aeron* prevented it from reopening its 1978 adequacy determination. The unsubsidized shippers also complained that the Board failed to consider a ruling requiring Aeron to carry preference cargoes at world rates or rates "directly influenced" by world rates. Aeron, in turn, argued that the bid augmentation rule forces it to bid at unreasonably low rates, that the subsidy abatement scheme is inconsistent with the 1970 amendments, and that the Board arbitrarily applied its liner subsidy reduction formula to bulk vessels without accounting for the relevant differences between the liner and bulk carriage industries.

On motions for summary disposition from all sides, the district court concluded that the Board had discretion to reconsider its earlier adequacy finding notwithstand-

to lower proportionally the amount of ODS used to augment bids if a subsidized shipper was forced to abate a portion of its ODS in the previous year. *See Final Rulemaking,* 49 Fed. Reg. at 39,849.

17. The relevant portion of MarAd's interim rate regulation reads as follows:

When a subsidized bulk cargo vessel operator is the apparent low U.S.-flag bidder for a dry bulk preference cargo, the responsible department or agency shall evaluate the subsidized operator's bid by (1) requesting from MarAd an amount for the operating differential subsidy (ODS) applicable to the carriage of cargo as a cost per ton for performing the voyage by the apparent low bidder and any other bidders that are subsidized; (2) deriving "augmented bids" for the subsidized operators by adding the ODS amount to each subsidized operator's bid; (3) comparing the augmented bids of the subsidized operators and the bids of unsubsidized operators to determine the apparent low bidder; (4) requesting from MarAd a fair and reasonable guideline rate (which shall be based on the operator's anticipated costs for the voyage plus a reasonable amount for profit) for the apparent low bidder; and (5) comparing the guideline rate to the subsidized operator's augmented bid or the unsubsidized operator's bid.

*Interim Rulemaking,* 49 Fed.Reg. at 2900. The preference cargo contract is awarded to the low responsive bidder provided that its bid is at or below the guideline rate. *See id.* at 2899. In its Final Rulemaking, MarAd offered a slightly different description of step "5" under the interim rule. *See Final Rulemaking,* 49 Fed.Reg. at 39,-847 ("Under the interim rule, ... the agency requests from MarAd a 'fair and reasonable' guideline rate for the low bidder, and compares the rate to the *un*augmented bid of the subsidized carrier or the bid of the unsubsidized carrier, as the case may be.") (emphasis added). The final rule adopts this version without noting any change. *See id.* at 39, 851 (to be codified at 46 U.S.C. 381.8(b) (1985)). The parties in this case have ignored the difference, *see* AMA's Brief at vii (stating that final rule essentially adopts the interim rule framework); Phoenix's Brief at 15 (same); Aeron's Reply Brief at 26–27 (same); Government's Brief at 11 (same); no party has specifically faulted the interim rule for comparing augmented rather than unaugmented bids to the guideline rate. In any event, we uphold the interim rule's bid augmentation scheme under either formulation for the general reasons stated below. *See infra* pp. 559–561.

ing our opinion in *Aeron* and therefore directed the Board to determine whether it should do so. *See American Maritime Ass'n v. United States,* Civ. No. 84–249, mem. op. at 9–11 (D.D.C. Aug. 20, 1984).[18] The district court also ruled that the combination of cost-based rates and the bid augmentation rule constituted a reasonable interpretation of the 1970 amendments and our *Aeron* mandate, *see id.* at 12–14, and it upheld the subsidy abatement scheme without discussion. On appeal, both Aeron and the unsubsidized shippers press their challenges to the Board's rate decision, and Aeron again challenges the subsidy abatement scheme. The government has not appealed the district court's ruling that the Board retains discretion to reconsider its 1978 adequacy finding; only Aeron argues that the Board cannot under any circumstances reopen that proceeding.

## II. THE BOARD'S REFUSAL TO RECONSIDER ITS ADEQUACY FINDING

■ Section 605(c) of the Act prohibits ODS ships from participating in shipping trades already served by U.S.-flag vessels unless the Secretary determines that "the service provided by vessels of the United States registry is inadequate and that in the accomplishment of the purposes and policy of [the Act] additional vessels should be operated thereon." 46 U.S.C. § 1175(c). As a general matter, existing U.S.-flag service is considered "adequate" under this provision if domestic vessels can carry 50 percent or more of all dry bulk preference cargoes. *See Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 767 (D.C.Cir.1977); *Atlas Marine,* 18 Ship.Reg.Rep. at 997. Section 605(c) is clearly designed to prevent "overtonnage" in a particular trade and thus to protect existing U.S.-flag carriers from the undue competitive harm that would result from excess capacity. *See Aeron,* 695 F.2d at 574.

In its petition to reopen the Board's 1978 adequacy determination, the AMA pointed

to a 1981 MarAd staff study which concluded that the addition of Aeron's seven ships to the preference cargo trade would severely over-tonnage the trade. *See* Staff Review of Subsidized Vessel Participation in the Cargo Preference Trades 10–16 (1981) (summarized at 46 Fed.Reg. 29,300 (May 31, 1981)). The AMA and Phoenix also argued that intervening changes in the shipping industry had rendered existing U.S.-flag service in the preference trade adequate. *See Final Order,* 22 Ship.Reg. Rep. at 604. The Board apparently took two positions on the motion for reconsideration. In its Tentative Order on remand, the Board reasoned that the unsubsidized shippers' new evidence did not warrant a reconsideration of the 1978 adequacy finding. In particular, the Board concluded that the staff study was based on faulty premises, that the extra-record evidence cited by the AMA was not suitable for agency notice, and that the record must close at some point. *See Tentative Order,* 22 Ship. Reg.Rep. at 322–23. This initial assessment was arguably within the Board's discretion. *See, e.g., Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974) (agency refusal to reopen record only reversible for abuse of discretion); *Eastern Carolinas Broadcasting Co. v. FCC,* 762 F.2d 95, 103 (D.C.Cir. 1985) (same)

In its Final Order, however, the Board clearly repudiated this position and concluded instead that our decision in *Aeron* stripped it of any discretion to reconsider the 1978 finding with respect to Aeron's application for entrance into the preference trade.

The chief problem with intervenors' contentions is that the courts' remand allowed the Board *no discretion* in admitting the [Aeron] vessels into the subsidized preference trades. It is not possible to reopen the Board's 605(c) finding that the relevant preference trades are

**18.** The district court expressly declined, however, the AMA's request that it order the Board to reopen the 1978 adequacy proceedings.

and will be inadequately served by U.S.-flag vessels without allowing the possibility that if there is adequate service, some or all of the [Aeron] vessels could not be permitted in the subsidized preference trades. The courts unequivocally ordered the Board to admit the [Aeron] vessels into the preference trades. . . .

The Board does not reach whether trade conditions have materially changed since the 1978 decision. The Board simply *does not have the authority* to refuse to comply with the district court order to admit the [Aeron] vessels into the preference trades.

*Final Order,* 22 Ship.Reg.Rep. at 604 (emphasis added) (footnote omitted).

■ We agree with the district court that our *Aeron* opinion should not be read to bar the Board from considering whether the 1978 adequacy proceedings should be reopened. In *Aeron,* we concluded that the Board could not rationally admit only two of Aeron's ships once it had determined that existing U.S.-flag service was inadequate within the meaning of section 605(c) and that the admission of all seven Aeron ships would not result in undue competitive harm to existing U.S.-flag vessels. *See Aeron,* 695 F.2d at 575. We held only that

> [i]t was arbitrary and capricious for the Maritime Subsidy Board, *after finding inadequate service in the bulk preference trades,* to nonetheless admit only two of the seven Aeron ships. . . . The decision of the district court is affirmed on admitting all Aeron ships.

*Id.* at 582 (emphasis added).[19] Our conclusion that the Board must admit all seven Aeron ships to the preference trade was thus solely premised on the Board's failure to relate rationally its adequacy findings to its admission decision. *See id.* at 575. We did *not* review the adequacy finding itself, *cf. id.* at 572 n. 16, and nothing in our opinion suggested that the Board was not free, to whatever extent agencies normally are, to reconsider that factual determination in light of changed circumstances.[20]

In its original section 605(c) opinion in this case, moreover, the Board explicitly reserved the option of revising its adequacy determination to reflect possible changes in the tonnage needs of the bulk preference trade. "The 605(c) findings on these applications," the Board noted, "survive until they become 'stale,' *i.e.,* are over-

**19.** We also left open the possibility that the Board might, under special circumstances not present in 1978, find that existing service was inadequate but that the purposes and policy of the Act favored only the partial admission of subsidized vessels. *See Aeron,* 695 F.2d at 574–75. We noted, however, that the Act generally favors new entry once the Board determines that existing U.S.-flag service in the preference trade is inadequate. *See id.*

**20.** Aeron is undoubtedly correct that the Board did not have authority to disregard the district court's original order, affirmed by this court, directing the admission of all seven ships to the preference trade in 1982. The Board, however, plainly complied with that order. *See* Letter to Apex Marine Corporation from Georgia Stamas (Aug. 5, 1982), R. Item 16, Ex. 2 (admitting the remaining five Aeron vessels in accordance with the district court's order); *Final Order,* 22 Ship.Reg.Rep. at 602. It was *after* the admission of all seven Aeron vessels that the AMA petitioned, pursuant to Board regulations, for a new proceeding to reconsider the 1978 adequacy finding itself. *See* Petition of American Maritime Association to Reopen for Reconsideration and to Vacate, Docket No. A–132, at 4–7 (Aug. 18, 1982), R. Item No. 16, Ex. 3; *see generally* 46 C.F.R. § 201.173 (1984) ("Upon a petition and showing of compelling cause, . . . the Administration may at any time reopen any proceeding . . . for . . . reconsideration . . . [in light of] changed circumstances.") At that point, the Board had fully complied with the admission order, and that order did not prevent the Board from reconsidering the 1978 section 605(c) finding to whatever extent it is permitted to do so under the Act. *See, e.g., United Gas Improvement Co. v. Continental Oil Co.,* 381 U.S. 392, 404–06, 85 S.Ct. 1517, 1524–25, 14 L.Ed.2d 466 (1965); *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 286–87 (D.C.Cir.1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). Although reopened proceedings might eventuate in the exclusion of Aeron's vessels, nothing in the district court's original order or either *Aeron* opinion bound the Board to disregard agency practice with respect to *future* adequacy proceedings. *Cf. State Marine Int'l, Inc. v. Peterson,* 518 F.2d 1070, 1080 (D.C.Cir. 1975) (noting that ODS contracts are expressly conditioned on any prospective MarAd ruling implementing a reasonable interpretation of the Act), *cert. denied,* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976).

come by changes in the market or subsequent events. Obviously, that length of time cannot be predicted." *Aeron*, 19 Ship. Reg.Rep. at 496 (footnotes omitted). The Board thus clearly left open the possibility of further adequacy proceedings in light of, say, massive economic changes, and neither this court nor the district court questioned that ruling in *Aeron*. *Cf. Aeron*, 525 F.Supp. at 545 n. 37 (explicitly recognizing that the Board might "abandon" its section 605(c) opinion in light of Aeron's experience in the preference trade). Unquestionably, then, our *Aeron* opinion did not deprive the Board of discretion to reopen the 1978 adequacy proceeding if circumstances so warranted. *See generally* 46 C.F.R. § 201.173 (1984) (establishing procedures for reopening Board proceedings in light of changed circumstances).

■ Aeron also contends that, regardless of our *Aeron* mandate, the Board cannot reopen the 1978 proceeding because the Act contemplates a single, final "inadequacy" finding and because Aeron has justifiably relied on the Board's 1978 determination.[21] The district court did not rule on either argument and instead directed the Board to consider these issues on remand before it determines whether intervening changes in the bulk shipping industry warrant reopening the record. The Board is currently doing so.[22] While Aeron's arguments are not insubstantial, we agree with the district court that the agency should be given an opportunity to develop facts concerning Aeron's reliance on the 1978 decision and to express a view as to whether Congress intended section 605(c) findings to be final. The Board's consideration of those issues will, of course, be subject to judicial review at the appropriate time.

We therefore affirm both the district court's ruling that our opinion in *Aeron* does not prevent the Board from reopening the adequacy findings and its order directing the Board to consider whether it should do so in light of Aeron's reliance on the 1978 decision, the purposes of section 605(c), and the alleged changed circumstances.

### III. THE RATE DECISION

In *Aeron*, we directed the Board to balance Congress' dual intent to have subsidized ships carry preference cargoes and to have them do so at world rates. We therefore instructed the Board to consider a rate approaching world rates (i.e., one lower

---

21. The Board awards 20-year ODS contracts to subsidized vessels; those contracts embody, among other things, the statutory prohibition on participating in the preference trade unless the Secretary determines that existing U.S.-flag service is inadequate. Aeron's ships entered the preference trade after its 20-year ODS contracts were amended to remove any restriction on carrying preference cargo in light of the Board's 1978 section 605(c) determination. Aeron now argues that the 1978 inadequacy finding cannot be reopened both because it has a contractual right to bid for preference cargo for the duration of its 20-year contract and because it adjusted its operations in reliance on the ability to carry preference cargo given the Board's inadequacy determination. Phoenix suggests that Aeron has not in fact acted in reliance on the 1978 order and that, in any event, any reliance was unjustifiable in light of the Board's statement that it would reconsider the 1978 finding in light of changed circumstances. *See supra* p. 558.

22. Shortly after the district court's order in this case, the Board requested briefing on the following issues:

1) Whether Congress intended that a finding under Section 605(c) of the Merchant Marine Act of 1936, as amended is final, or contemplated modification.
2) Whether a binding contractual relationship presently exists between the Board and Aeron et al. providing for the carriage of preference cargo with subsidy.
3) Whether the Board is precluded from reconsidering entry of Aeron et al. into the preference trade by Aeron's reliance on a continued period of access.
4) Whether the original Section 605(c) decision in Docket No. S–605 is stale and should be reviewed.
5) Whether U.S.-flag service in the preference cargo trade is presently and for the future will be adequate.
6) Whether in the accomplishment of the purposes and policy of the Act, additional vessels should be operated in the preference trade.

Letter from Georgia Stamas to Aeron, Phoenix and the AMA 2 (Oct. 11, 1984), *reprinted in* Phoenix's Brief at Addendum C.

than premium rates) but high enough to provide reasonable incentives for subsidized vessels to enter the preference trade. *See Aeron,* 695 F.2d at 579; *supra* pp. 551–553. We did not, however, conclude that the Board must *guarantee* Aeron a profit in the preference trade notwithstanding the goals of the Act.

> [B]ecause Aeron can continue to operate its ships in the nonpreference trades, an unprofitable rate for preference cargo would not raise any fifth amendment concerns. Thus, the question is purely one of statutory construction: What did Congress intend (or if it had no specific intent, what would it have wanted) the term "fair and reasonable rates for United States-flag commercial vessels" to mean as applied to subsidized bulk ships?

> We do not decide that question today. On remand, the Subsidy Board should consider whether the rate it selects will allow Aeron to earn a reasonable profit. If not, it should explain why the language and legislative history of the Merchant Marine Act justify the chosen rate.

*Aeron,* 695 F.2d at 582. We thus directed the Board to consider a rate scheme that would effectuate Congress' desire to have subsidized vessels carry preference cargoes but to do so at relatively low rates and therefore reduce the overall cost of preference cargo carriage. *See id.* at 578–79.

On remand, the Board determined that subsidized vessels would not be attracted to the preference trade at world rates and that some form of cost-based or premium rate structure was therefore necessary to effectuate Congress' intent to have subsidized vessels carry preference cargo. *See Tentative Order,* 22 Ship.Reg.Rep. at 324. Accordingly, the Board and MarAd fashioned a rate structure for subsidized preference cargo carriage that allows Aeron to bid for preference cargo at cost-based rates, net of ODS, and requires government shipper agencies to augment an Aeron vessel's bid by an amount equal to the ship's expected ODS before comparing its bid to that of an unsubsidized shipper.

As MarAd explained, this scheme is intended to balance the competing goals of the 1970 amendments by both attracting Aeron to the preference trade and insuring that government preference cargo costs will be reduced if Aeron secures preference cargo contracts.

> MarAd believes that this rule will produce a fair rate for subsidized operators, eliminate the potential economic advantage that subsidized vessels might have over unsubsidized carriers, and ensure use of the vessel with the lowest cost to the government. MarAd believes that the rule will promote competition by rewarding vessel operators who cut operating costs and reduce profits, instead of incidentally rewarding an operator because of its receipt of subsidy. This should mean somewhat lower costs to the agencies over the long-run.

*Interim Rulemaking,* 49 Fed.Reg. at 2899. MarAd thus reasoned that the rule furthered Congress' aim to reduce the overall government cost of the preference cargo program by accounting for both direct (ODS) and indirect (premium rate) subsidies. The rule ensures, in other words, that subsidized bulk carriers carry preference cargoes at a lower overall cost to the government than the premium rate charged by the unsubsidized operator. *See id.; infra* note 23. MarAd also stressed that, consistent with Congress' expectations, the rule protects unsubsidized shippers from virtual displacement in the preference trade during the transition to a direct subsidy program for bulk vessels by preventing a subsidized operator from winning a contract by bidding slightly below the premium rate while receiving the full amount of its bid plus ODS. *See Interim Rulemaking* at 2898–99. At the same time, the rule retains an incentive for subsidized carriers to carry preference cargoes by permitting them to charge a rate that includes a reasonable profit. *See Tentative Order,* 22 Ship.Reg.Rep. at 324.

Although the Board's rate structure allows Aeron to bid for preference cargoes at cost-based or premium rates, then, both the bid augmentation rule and the exclusion of

ODS-covered costs from a subsidized vessel's cost base ensure that the actual preference cargo rates paid to Aeron will be substantially lower than the premium rates paid to unsubsidized operators. The bid augmentation rule, for example, clearly operates to drive Aeron's bids substantially in the direction of world rates. Because its bids are augmented by an amount equal to its ODS, Aeron must bid at an amount substantially below an unsubsidized operator's "unaugmented" bid in order to win any particular preference cargo contract. *Cf. Final Rulemaking,* 49 Fed.Reg. at 39,-849.[23] Similarly, because ODS costs are excluded from its cost base, a subsidized vessel will have a lower "fair and reasonable" rate ceiling than an unsubsidized vessel with comparable costs. *See Tentative Order,* 22 Ship.Reg.Rep. at 324.[24] Thus MarAd and the Board designed a rate structure that drives Aeron's rates in the direction of world rates but retains sufficient incentives for Aeron to enter the preference trade. *Cf. id.* ("Although this action will not eliminate premium rates [for subsidized ships], it will lower those rates thus conforming in part with the intentions of Congress at the time of the passage of the 1970 Act.").

We must, of course, accord substantial deference to an interpretation of a statute forged by the officers or agency charged with its administration. *See, e.g.,* *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Aeron,* 695 F.2d at 575. Where, as here, Congress has conferred broad discretion on an agency to implement possibly conflicting legislative goals, *see Aeron,* 695 F.2d at 575–77; *supra* pp. 10–11, we must accept the agency's interpretation unless manifestly unreasonable. *See, e.g., Aeron,* 695 F.2d at 575. In this case, we believe that MarAd's augmentation rule reasonably accomplishes Congress' aim to lower the overall government costs of the preference cargo program and that the overall rate structure strikes a permissible balance between the competing interests of unsubsidized and subsidized shippers and between Congress' dual intent to have subsidized ships carry preference cargoes but to do so at world rates. Given the limited scope of our review, we therefore conclude that MarAd's attempt to implement the 1970 amendments "represents a reasonable accommodation of the conflicting policies that were committed to the agency's care by the statute." *Chevron, U.S.A. v. Natural Resources Defense Council,* — U.S. ——, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984) (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

Both Aeron and the unsubsidized shippers nonetheless argue that the rate decision is inconsistent with one or another of the conflicting congressional goals behind

---

**23.** If, for example, an unsubsidized vessel could bid at $65 per ton for a particular preference cargo contract and a subsidized vessel would receive $20 per ton ODS for the contract, Aeron must bid below $45 per ton in order to win the contract since the relevant shipper agency will augment Aeron's bid by $20 per ton before comparing it to those of the unsubsidized shippers. *See supra* note 13. Thus, the bid augmentation rule will force subsidized vessels to bid substantially below the premium rates paid to unsubsidized shippers in order to secure a preference cargo contract. The rule also ensures that subsidized vessels carry preference cargoes at a lower overall government cost than unsubsidized vessels. Assuming that the world rate for this contract is $25 per ton, *see id.,* an Aeron bid below $45 per ton results in a government cost of below $40 per ton ($20 ODS plus $20 premium)—i.e., less than the $40 per ton premium that would be paid to the unsubsidized vessel.

**24.** Suppose, for example, a subsidized and an unsubsidized vessel both have actual costs of $60 per ton for a particular preference cargo contract and the subsidized vessel would receive $20 per ton ODS. Under the Board's rate structure, the subsidized vessel's section 901 or "fair and reasonable" guideline—the maximum it could bid on the contract—would be calculated by adding a reasonable profit to $40 per ton (cost net of ODS), while the unsubsidized vessel could bid at a cost-plus rate based on $60 per ton. Even in the absence of competitive bidding, then, the subsidized shipper's rates would be substantially lower than the rates paid to unsubsidized operators. As the AMA points out, the guideline rate in many instances has little practical effect because the bid augmentation rule already forces a subsidized vessel's bid below the fair and reasonable rate ceiling.

the 1970 amendments. In effect, Aeron complains that the Board's rate structure is unreasonably low given Congress' expectation that subsidized vessels would take over the preference trades. Both the AMA and Phoenix counter that Aeron's rates are impermissibly high in light of Congress' intent to have subsidized vessels carry preference cargoes at world rates or a close approximation thereof. We discuss, and reject, each challenge in turn.

## A. Aeron's Challenge

Aeron first argues that MarAd cannot, as it does in the bid augmentation rule, treat ODS as a "cost" incurred by the government to finance preference cargo carriage because ODS is awarded to subsidized operators whether they carry preference cargoes or other cargoes. Accordingly, Aeron argues, the bid augmentation rule irrationally assumes that the government will "save" ODS if Aeron's preference cargo bids are unsuccessful and Aeron continues to carry commercial (i.e., nonpreference) cargoes. As MarAd pointed out, however, the rule makes no such assumption. Instead, the rule attempts to account for the total government-wide costs that are reasonably related to the carriage of individual *preference cargoes.* Aeron's argument, by contrast, assumes that the only relevant preference cargo costs are the indirect subsidies paid by shipper agencies in the form of premium rates, not the ODS subsidies independently paid to bulk vessels by MarAd. Congress clearly thought otherwise: it believed that the "costs" of subsidized preference cargo carriage (*i.e.,* direct ODS costs) would be lower than the costs of the premium rate system. *See, e.g., House Report* at 38. In light of Congress' appreciation that ODS

would constitute a subsidy for preference cargo carriage, Aeron cannot seriously argue that the government does not incur a preference cargo "cost" when it pays subsidized vessels ODS for, among other things, transporting preference cargoes. It was therefore indubitably rational of MarAd to treat the ODS received by subsidized vessels as a cost of preference cargo carriage.

The gist of Aeron's claim, however, is that, regardless of whether it lowers government costs, the bid augmentation rule thwarts Congress' intent to have subsidized vessels carry preference cargoes with the full advantage of ODS. Because Congress determined that subsidized vessels should carry all preference cargoes once existing U.S.-flag service became inadequate, Aeron reasons, any rate structure that discourages them from doing so to the fullest extent possible is unlawful.[25] If the 1970 amendments were *only* designed to displace *immediately* the unsubsidized carriage of preference cargoes, Aeron would have a strong argument: MarAd's rate structure clearly prevents subsidized operators from underbidding unsubsidized suppliers at relatively high rates in all circumstances. Yet Congress' desire to have subsidized vessels take over the preference trade was tempered by several competing goals, each of which is served in part by the bid augmentation rule. First, Congress quite specifically envisioned that subsidized vessels would *eventually* carry preference cargoes at *world rates,* not premium rates, and the bid augmentation rule clearly operates to drive Aeron's rates in the direction of world rates. *See supra* pp. 559–560. Likewise, Congress clearly intended the 1970 amendments to *reduce* the government cost of preference cargo carriage; that goal will only be achieved if subsidized

---

25. Aeron also suggests that the bid augmentation rule impermissibly conflicts with certain Department of Agriculture regulations concerning the evaluation of preference cargo bids. Even if that were so, a shipper agency's rules concerning preference cargoes must conform to MarAd regulations in light of section 901(b)(2) of the Act, which provides that all government agencies involved in preference cargo carriage "shall administer its programs ... under regula-

tions issued by the Secretary of Transportation." 46 U.S.C. § 1241(b)(2). Congress clearly intended MarAd to control the subsidized carriage of preference cargoes and that shipper agencies would adjust their preference cargo procedures to conform with MarAd's. *See* S.Rep. No. 1080, 91st Cong., 2d Sess. 58–59 (1970); H.R.Rep. No. 1555, 91st Cong., 2d Sess. 6 (1970) (conference statement of House managers); 116 Cong.Rec. 32, 511 (1970) (statement of Sen. Griffin).

operators carry preference cargoes, as they must under MarAd's rate scheme, at rates substantially below the premium rates paid to unsubsidized carriers. *See id.* Congress also sought to protect existing unsubsidized carriers during the transition to the direct subsidy program, *see supra,* pp. 550–551, and the bid augmentation rule accomplishes that purpose by preventing subsidized vessels from consistently winning preference cargo contracts by bidding a few dollars below premium rate. *See supra* p. 559. Finally, Aeron's challenge also ignores the central purpose of the 1970 amendments—to encourage the construction of U.S.-flag bulk vessels capable of competing with *foreign-flag* carriers in the *worldwide* commercial market. *See supra* pp. 549–550. Allowing Aeron to bid for preference cargoes at high premium rates without adjustment for ODS might well encourage Aeron to abandon the commercial market in search of higher profits in the preference trade. Congress certainly did not intend the 1970 amendments to displace U.S.-flag unsubsidized bulk service in the preference trade at the cost of further weakening the competitive status of U.S.-flag bulk vessels in the world market.[26]

On balance, then, we cannot say that MarAd's attempt to balance the competing goals of the 1970 amendments resulted in an unreasonably low rate for the subsidized carriage of preference cargoes.

### B. The Unsubsidized Shippers' Challenges

In *Aeron,* we left open the possibility that a reasonable accommodation of the conflicting goals embodied in the 1970 amendments could result in world rates, despite our concern that an unprofitable rate would prevent the subsidized carriage of preference cargoes. *See Aeron,* 695 F.2d at 582 ("[If the Board chooses an unprofitable rate,] it should explain why the language and the legislative history of the Merchant Marine Act justify the chosen rate."). Phoenix now argues that the entire rate decision must be remanded because the Board mistakenly read our *Aeron* mandate to bar world rates and therefore failed to give serious consideration to a world rate structure. In support of this contention, Phoenix points to language in the Board's first (and tentative) order on remand suggesting that the Board thought itself precluded from adopting world rates after *Aeron. See, e.g., Tentative Order,* 22 Ship.Reg.Rep. at 324 ("In light of the appeals court decision, the only possible alternative by the Board is to allow the carriage of preference cargo with ODS at premium rates.")[27]

We believe that Phoenix has mischaracterized the Board's overall treatment of the world rate issue. In their comments on the Tentative Order, both Phoenix and the AMA vigorously urged the Board to adopt a world rate structure for Aeron's carriage of preference cargoes. *See Final Order,* 22 Ship.Reg.Rep. at 607 (discussing those

---

**26.** We also note that Aeron has not pointed to any evidence disputing the Board's and MarAd's finding that the rate decision will encourage subsidized vessels to enter the preference trade by allowing them to earn a reasonable profit on preference cargo contracts. *Compare, e.g., Aeron,* 695 F.2d at 578–81 (discussing indications that the Board's original rate structure prevented Aeron from serving the preference trade). Even under the bid augmentation rule, after all, Aeron can carry preference cargoes at an overall price (i.e., its bid plus its ODS) above the world rates it currently receives in the commercial market. Instead, Aeron stakes its claim on the view that Congress intended to allow subsidized vessels to take over immediately the preference trade, to the greatest extent possible and with the full advantage of ODS, once the Secre-

tary determined that existing U.S.-flag service was inadequate.

**27.** The district court did read our *Aeron* decision erroneously to preclude the possibility of world rates.

> To induce the subsidized ships to bid for preference cargo, the Court of Appeals has prohibited the Board from limiting the subsidized carriers to world rates, and required that the rate provide a potential for profit.

*See American Maritime Ass'n,* No. 84–249, mem. op. at 3. It therefore did not consider whether the Board had exercised its full discretion in determining that cost-based rates plus the bid augmentation rule would best accommodate the conflicting goals of the 1970 amendments.

comments). The Board clearly considered the unsubsidized shippers' comments and just as clearly determined that a cost-based rate structure was the "best practical means" of accommodating Congress' conflicting goals as discussed in *Aeron*. *See id.* In its attempt to balance those goals, the Board specifically found, for example, that world rates have failed to encourage the subsidized carriage of preference cargoes and have thus thwarted Congress' expectation that subsidized vessels would carry preference cargoes once existing service became inadequate. *See id.* ("Experience of more than four years has shown that [Aeron] has not been sufficiently attracted to the preference trades at world rates."). Accordingly, the Board explicitly determined that Congress' intent to have subsidized vessels carry preference cargoes at world rates could best be met by a cost-based rate structure that drives Aeron's rates in the direction of world rates. *See Tentative Order,* 22 Ship.Reg.Rep. at 324; *see also Interim Rulemaking,* 49 Fed.Reg. at 2898–99.[28] Our decision in *Aeron* did not place on the Board any special burden of explaining why world rates were *not* appropriate for the subsidized carriage of preference cargoes. Instead, we directed the Board to consider whether its chosen rate will allow Aeron a profit and, *if not,* to justify the rate in light of the Act and its legislative history. *See Aeron,* 695 F.2d at 582. Given this mandate, we are confident the Board exercised its full discretion in selecting the rate structure that, in its view, struck the most reasonable balance between the conflicting goals committed to the agency's care by statute.

The AMA's challenge to the rate decision is somewhat more technical, though no more persuasive. The AMA contends that Congress has allowed only two options for the carriage of preference cargoes: subsidized carriage at rates approximating world rates or unsubsidized carriage at premium rates. Under this view, the Board must require subsidized vessels to charge world rates or a close approximation if they are to be allowed to carry preference cargoes. While it recognizes that the bid augmentation rule forces subsidized vessels to bid substantially below premium rates, and therefore constitutes a step in the direction of world rates, the AMA argues that the rate structure does not go far enough. Specifically, the AMA reasons that a bid augmentation rule could only approximate a world rate structure if Aeron's bids are adjusted to account for all government subsidies—CDS as well as ODS. The AMA contends, in other words, that CDS *must* be considered a direct cost of preference cargo carriage and that premium rates are *only* permissible under the Act if a subsidized shipper's bid is augmented by the amount of both its ODS for the relevant contract and a proportional share of its CDS.

As we noted in *Aeron,* however, Congress did not place the agency in any such regulatory straightjacket. Instead, Congress accorded MarAd and the Board broad authority to establish the rate for preference cargo carriage in light of the 1970 amendments. *See Aeron,* 695 F.2d at 575–77. Given that discretion, we believe that MarAd could reasonably respond to the AMA's complaint by noting that CDS, unlike ODS, is normally treated as a one-time subsidy to shipyards and shipbuilders to encourage American-built vessels rather than as an ongoing payment to ship operators to offset the cost of preference cargo carriage. In *States Marine International v. Peterson,* 518 F.2d 1070 (D.C.Cir.1975), *cert. denied,* 412 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976), for example, this court expressly recognized that CDS and ODS serve distinct purposes under the Act and that MarAd can rationally distinguish between the two for the purposes of administering subsidy programs.

The Report of the House Committee on the 1970 amendment made it clear that CDS has an entirely different purpose

---

**28.** Both Phoenix and the AMA concede that the bid augmentation rule will drive Aeron's rates substantially in the direction of world rates. *See* AMA's Brief at 22–24; Phoenix's Brief at 38.

than ODS: "[T]he construction subsidies are subsidies to the shipyards, not to the shipowners."

The purpose of the CDS program is to subsidize *shipyards* of this country to enable them to compete effectively with foreign shipyards.... The only restrictions on payment of CDS listed in [the Act] are that the ship receiving subsidy be registered in the United States and be engaged in foreign commerce. Congress made no distinction between domestic purchasers who could or could not avail themselves of CDS. Instead, the section provides that all ship purchasers who qualify may buy ships which are eligible for CDS payments. *The Act does not distinguish between those carrying preference cargo and those not carrying such cargo.*

*Id.* at 1083 (quoting *House Report* at 30) (emphasis added); *cf. American Maritime Ass'n v. Stans,* 329 F.Supp. 1179, 1185–86 (D.D.C.1971), *aff'd,* 485 F.2d 765 (1973). We think the reasoning of the *States Marine* court fully applicable here. Because Congress designed ODS and CDS subsidies to serve substantially different purposes, MarAd could reasonably decline to regard CDS as a direct cost of preference cargo carriage. Although augmenting a subsidized vessel's bid by a CDS factor might

further drive its rates in the direction of world rates, we do not believe that MarAd was *required* to do so under the statutory scheme.[29]

We therefore reject both Phoenix's suggestion that we remand for further consideration of whether world rates are appropriate and the AMA's argument that MarAd is required to adjust Aeron's bid to account for its receipt of CDS as well as ODS.

## C. *The Reasonableness of the Rate Structure*

At bottom, then, we find that MarAd and the Board acted within their discretion in concluding that a cost-based rate structure plus the bid augmentation rule would strike a reasonable balance between "Congress' dual objectives to have subsidized ships carry preference cargos and have subsidized ships carry those cargos at world rates." *Aeron,* 695 F.2d at 579. Both Aeron's and the unsubsidized shippers' challenges to the rate decision seize on a single aspect of those competing objectives. Aeron emphasizes Congress' expectation that subsidized vessels would take over the preference trade, while Phoenix and the AMA focus on Congress' assumption that they would do so at world rates. Given the present realities of the

**29.** The AMA also points to section 614 of the Act, 46 U.S.C. § 1184, in support of its theory that MarAd must augment Aeron's bids by a proportional amount of its CDS as well as its ODS. That section of the Act was amended in 1981 to allow "any operator receiving operating differential subsidy funds [to] elect ... to suspend its operating differential subsidy contract with all attendant statutory and contractual restrictions, [with exceptions not relevant here], if ... the owner agrees to pay the Secretary ... [a proportional amount of] the construction differential subsidy." Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 1603, 95 Stat. 357, 751 (codified at 46 U.S.C. § 1184(a)(4)) (the Snyder amendment); *see* Maritime Appropriation Authorization Act for Fiscal Year 1980, Pub.L. No. 96–112, § 2(2)(B), 93 Stat. 847, 847 (originally enacting the Snyder amendment).

The AMA reads this amendment as evidence that Congress intends to treat CDS as a direct cost of preference cargo carriage and thus requires the Board to adjust Aeron's bids by a CDS

factor if Aeron is allowed to charge cost-based rates. We reject this view of the Snyder amendment. Although section 614 allows subsidized vessels to operate as unsubsidized ships by repaying both CDS and ODS, its legislative history makes quite clear that the provision is not intended to "supplant any other authority that the Maritime Administrator now has ... to allow subsidized vessels to carry preference cargoes without repayment of construction-differential subsidy." H.R.Rep. No. 556, 96th Cong., 1st Sess. 5 (1979) (conference report). Congress did not intend the Snyder Amendment to be the exclusive means by which a subsidized operator could enter the preference trade and it did not intend to *require* such carriers to do so as a condition of preference cargo carriage. *See Final Order,* 22 Ship.Reg.Rep. at 606–607; *see also* Hearings Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries, 96 Cong., 1st Sess. 321–22, 329 (1979) (statement of Rep. Snyder).

bulk shipping market, however, neither goal can be attained without sacrificing the other. The Board and MarAd accordingly developed a compromise position: Aeron can carry preference cargoes at cost-based rates that allow for a reasonable profit, but it must bid substantially below the premium rates charged by unsubsidized shippers in order to secure preference cargo contracts. This result fairly meets our call in *Aeron* for rates that, "so far as practicable, approach world rates ... [but are] high enough to provide reasonable incentives for subsidized operators to carry [preference] cargos." *Id.* In light of the Board's discretion, we cannot say that the compromise rate structure is unreasonable.

## IV. The Subsidy Abatement Scheme

In its Tentative Order on remand, the Board determined that a subsidized vessel should be required to abate an escalating portion of its ODS if it derives more than half of its annual gross revenues from the carriage of preference cargoes. *See supra* note 15. The Board noted that this abatement scheme, which it applies to ODS liner vessels, would ensure that ODS was employed to meet foreign-flag competition as provided in section 601 of the Act. *See supra* pp. 554–555. That section provides, in relevant part, that:

> No ... application [for ODS] shall be approved by the Secretary of Transportation unless he determines that (1) the operation of such vessel or vessels in an essential service is required to *meet foreign-flag competition* and to promote the foreign commerce of the United States ... [and] (4) the granting of the aid applied for is necessary to place the proposed operations of the vessel or vessels *on a parity with those of foreign competitors,* and is reasonably calculated to carry out effectively the purposes and policy of this chapter.

46 U.S.C. § 1171(a) (emphasis added); *see also id.* §§ 1173–74 (also indicating that ODS is designed to meet foreign competition).

In interpreting this provision with respect to the award of ODS to liner vessels, the Board determined that the ODS paid to liner vessels is not being used to meet foreign competition if subsidized vessels derive more than half of their gross revenues from cargoes, such as preference cargoes, that are not carried at world rates and are not subject to foreign competition. *See* 46 C.F.R. § 280.4 (1984). In the course of considering Aeron's initial application to serve the preference trade, the Board extended its interpretation of section 601 to cover bulk vessels as well. *See Atlas Marine,* 19 Ship.Reg.Rep. at 493–95. At that time, the Board had no reason to believe that Aeron would abandon the commercial market in search of higher profits in the preference trade and it therefore did not adopt any subsidy abatement rule. *See Aeron,* 695 F.2d at 579 n. 36. When the Board decided to allow subsidized bulk vessels to charge cost-based rates on remand from *Aeron,* however, it created the possibility that those vessels would concentrate on the preference trade instead of the world-wide commercial market. The Board accordingly decided to apply its liner subsidy reduction formula to subsidized bulk vessels in order to ensure that ODS is primarily employed to meet foreign competition. *See Tentative Order,* 22 Ship.Reg. Rep. at 323–24.

In *States Marine,* this court concluded a subsidy abatement rule designed to prevent subsidized liner vessels from abandoning the commercial trades constituted a reasonable interpretation of section 601's requirement that subsidized ships compete in the world market.

> The Act consistently speaks of awarding subsidies only to vessels "meeting foreign competition." ... The Board's rule reducing subsidy when a vessel is not in "substantial competition" appears to strike a sound balance between the intention of Congress and the competitive needs of the industry. Additionally, the Board's decision that subsidies should be based upon the amount of competition cargo carried during the year rather than upon other formulae sug-

gested by the parties finds support in the language of the Act, which speaks of "service" instead of cargo or voyages. *States Marine,* 518 F.2d at 1082. We therefore upheld the particular subsidy reduction scheme the Board adopted for liner vessels in light of the Board's extensive proceedings concerning the relationship of the rule to the needs of the liner carriage industry. *See id.* (noting the extensive evidence compiled before the Board). In *Aeron,* we also recognized that the Board could condition Aeron's receipt of ODS on a reduction of subsidy under section 601 if it adopted a cost-based structure that would attract subsidized vessels to the preference trade. *See Aeron,* 695 F.2d at 579 n. 36.

■ Despite this general judicial approval, Aeron presses two challenges to the

Board's subsidy abatement rule.[30] First, Aeron contends that *any* subsidy reduction rule conflicts with the purposes of the 1970 amendments because it discourages subsidized vessels from taking over the preference trade, with the full advantage of ODS, to the greatest extent possible. Again, however, Aeron's challenge ignores the competing goals embodied in those amendments. Indeed, Congress' *central* purpose in extending ODS to bulk vessels was to make "a substantial inroad in the *commercial* [i.e., non-preference] bulk trade which we have now virtually forfeited to foreign carriers." *House Report* at 38 (emphasis added); *see id.* at 25; *see also Aeron,* 695 F.2d at 570. As we found in *States Marine,* a subsidy abatement rule permissibly encourages subsidized vessels to compete with foreign carriers in accordance with

**30.** Both the unsubsidized shippers and the federal appellees suggest that Aeron cannot challenge the subsidy abatement scheme before this court because it failed to do so before the agency. It is true that Aeron did not object to ODS abatement when first proposed by the Board in the Tentative Order. *See Tentative Order,* 22 Ship.Reg.Rep. at 324; *Final Order,* 22 Ship.Reg. Rep. at 608. At that point in the rate proceeding, however, the Board had only established that Aeron would be allowed to bid for preference cargoes at cost-based rates, net of ODS. When the Board announced in the Final Order that it would also condition Aeron's ability to participate in the preference trade on a bid augmentation rule, Aeron objected to the subsidy abatement rule at the next available opportunity, namely during MarAd's consideration of the interim rule. *See Final Rulemaking,* 49 Fed. Reg. at 39,849 (noting Aeron's comments). Aeron clearly raised its challenges to the subsidy abatement rule before the district court and on appeal.

Under these circumstances, we are not prepared to say that Aeron's failure to challenge the subsidy abatement scheme before MarAd adopted its interim rule precludes judicial consideration of that challenge. In many instances, claims not presented to an agency cannot be made for the first time to a reviewing court. *See, e.g., Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 156 (D.C.Cir.1985). That rule is at its strongest, however, when a specific statutory provision requires all objections to be raised at the agency level, *see, e.g., Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir.1983), and no such provision is operative here. At least in the absence of an explicit statutory directive, the general rule is ultimately a matter of judicial discretion and

will not be applied to perpetuate unfairness to the parties. *See Foundation on Economic Trends,* 756 F.2d at 156. In the proceedings under review, the Board first concluded that Aeron could bid for preference cargoes at cost-based rates subject to the subsidy abatement rule. Aeron was apparently willing to accept that regulatory structure. Once the agency supplemented its Final Order with the bid augmentation rule, Aeron determined that it could not accept the *combination* of a bid augmentation rule and a subsidy reduction rule. At that point, however, Aeron did not have the opportunity to object to the subsidy abatement rule in order to preserve its objection for judicial review of the Final Order and the interim rule. We do not believe that Aeron reasonably could have been expected to challenge the subsidy abatement at some point *before* the Board and MarAd adopted its complete regulatory structure for the subsidized carriage of preference cargo. Applying the general rule to bar Aeron's challenge now would, if anything, deprive Aeron of a reasonable opportunity to object to significant agency action.

In a rulemaking such as this one, moreover, an agency must justify the assumptions essential to its actions, notwithstanding a party's failure to challenge those assumptions before the agency, as part of its affirmative duty to engage in rational decisionmaking. *See Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 634–35 (D.C.Cir.1983); *National Lime Ass'n v. EPA,* 627 F.2d 416, 433 (D.C.Cir.1980). In light of Aeron's challenge before the district court and this court, we believe that the Board's somewhat reflexive application of its liner abatement scheme to bulk vessels must be considered such a vital assumption and should not escape judicial review. *Cf. id.*

that congressional goal. We therefore conclude that, in principle at least, a rule reducing ODS if a subsidized vessel derives substantial revenue from preference cargo carriage under present market conditions reasonably responds to Congress' expectation that ODS bulk vessels would compete with foreign ships in the world market.[31]

 Aeron also argues, however, that the Board failed to consider whether its *specific* liner abatement formula was ill-suited to the bulk carriage industry and instead arbitrarily assumed that its liner formula would result in the appropriate degree of participation by subsidized vessels in the preference trade. In particular, Aeron contends that the practical differences between bulk and liner carriage make the liner abatement formula unworkable and inappropriate when applied to bulk vessels. Liner vessels, Aeron suggests, can maintain significant preference cargo service without triggering subsidy reduction because only a small portion of an outbound liner voyage consists of preference cargo and because liners carry commercial cargo on the inbound leg. Aeron also points out that liners often operate at so-called conference rates which are not considered premium rates and therefore are not counted as preference cargo carriage for the purposes of subsidy reduction. *See* 46 C.F.R. § 280.5 (1984). As a result of these particular shipping characteristics, no liner has ever been required to abate subsidy. *See* Aeron's Brief at 24. By contrast, Aeron argues, bulk shippers have far fewer opportunities to carry preference cargo without triggering subsidy reduction. Bulk shippers carry large, ship-size cargo on extended chartered voyages, they do not operate at conference rates, and they typically do not carry inbound cargo. Thus a single carriage of preference cargo could occupy a bulk vessel for four months and account for nearly half of that vessel's annual revenues. *See id.* at 22–30. Consequently, Aeron contends, the

Board's reflexive application of the liner abatement formula to bulk carriers may in practice discourage subsidized bulk vessels from carrying more than a single preference cargo per year.

We cannot say that Aeron's challenge is frivolous. The Board's rate structure is expressly designed to encourage subsidized vessels to carry preference cargoes in accordance with the goals of the 1970 amendments. If Aeron's assessment of the effects of the subsidy abatement scheme on bulk carriers is correct, however, the Board's particular abatement formula could undercut that rationale by discouraging subsidized vessels from carrying any substantial number of preference cargoes each year. In the orders under review, the Board did not consider whether possible fact-specific differences between liner and bulk carriage required it to adjust its liner abatement formula before applying that formula to subsidized bulk carriers, and it did not consider the overall effects of the rule on Aeron's ability to carry preference cargoes. Instead, the Board apparently assumed that applying its liner rule to bulk vessels would result in an appropriate level of subsidized preference cargo carriage— that it would discourage Aeron from abandoning the commercial trade but nonetheless allow it to carry a reasonable number of preference cargoes. The federal appellees have not responded to Aeron's challenge to the Board's particular abatement formula. The AMA even states that applying the liner reduction formula to bulk shippers presents a number of conceptual and practical difficulties. *See* AMA's Brief at 31–33.

While the general principle of subsidy reduction finds support in the statutory scheme, then, the Board has failed to offer an adequate explanation of whether its particular abatement formula reasonably responds to the practicalities of the bulk carriage industry given the purposes and poli-

---

**31.** Our approval of the subsidy reduction principle in light of the current status of subsidized bulk vessels in the commercial market and the preference trade should not be taken to fore-

close future reconsideration or adjustment of that principle, if warranted, as market conditions change over time. *Cf. Aeron,* 695 F.2d at 579 n. 37.

cies of the Act. In the absence of such an explanation, we cannot uphold the Board's subsidy abatement scheme and must therefore remand the abatement formula to the Board for further consideration.[32] On remand, the Board should consider whether its abatement formula should be adjusted or redesigned in light of both the arguable differences between liner and bulk carriage and Aeron's argument that it thwarts the goals of the 1970 amendments by unreasonably preventing subsidized vessels from serving the preference trade. We do not in any way decide that question today. On remand, the Board is free to reject Aeron's account of the differences between liner and bulk carriage if it finds that account unpersuasive, to adjust its subsidy reduction rule in light of those differences, or to retain its current formula despite those differences or any evidence concerning the needs of bulk carriers provided that it explains why the Act's language and legislative history justify the chosen rule. *Cf. Aeron*, 695 F.2d at 582. We hold only that the Board must give due consideration to the nature of the bulk carriage industry in designing any particular subsidy reduction scheme aimed at both encouraging substantial subsidized preference cargo carriage and discouraging subsidized bulk vessels from abandoning the worldwide commercial market.

## V. Conclusion

We affirm the district court's ruling that our decision in *Aeron* did not preclude the Board from reopening its 1978 adequacy finding in light of intervening changes in the shipping industry and its order directing the Board to consider whether it should do so. We also agree with the district court that the combination of cost-based rates and the bid augmentation rule constitutes a permissible interpretation of the conflicting goals embodied in Congress' 1970 amendments to the Act. While we believe that a subsidy reduction rule is authorized by the Act, however, we conclude that the Board has failed to give sufficient consideration to whether its particular subsidy reduction formula reasonably furthers the goals of the 1970 amendments in light of the possible differences between liner and bulk carriage. We therefore reverse and remand the district court's judgment insofar as it upheld the subsidy abatement rule and direct the district court to set aside this single aspect of the orders under review and to remand to the Board for an adequate justification of its specific subsidy abatement formula.

*So Ordered.*

---

**32.** We order this limited remand with some reluctance. For several years, the Board and MarAd have conscientiously attempted to develop a regulatory structure for the subsidized carriage of preference cargoes in accordance with the aims of the 1970 amendments. For just as long, subsidized shippers have been trying to gain access to the preference trade. We intend this decision to hasten and not delay the parties' efforts to arrive at a reasonable implementation of the 1970 amendments. We uphold today MarAd's bid augmentation rule and the Board's fair and reasonable rate structure. Although we remand the portion of the Board's Final Order adopting the subsidy abatement rule, we do so *only* because the Board has not offered any explanation for why it chose its particular abatement formula. We are confident that the Board can promptly iron out this sole remaining kink by either providing such an explanation or by adjusting its abatement formula; that action, we trust, will establish a viable regulatory structure for the subsidized carriage of preference cargoes.

We further note that, in its final rulemaking, MarAd adjusted the bid augmentation rule to account for the effects of subsidy abatement on ODS payments. *See supra* note 16. This adjustment ensures that a subsidized vessel's ODS will not "count against" it twice—once in subsidy abatement and once in bid augmentation. *See Final Rulemaking*, 49 Fed.Reg. at 39,849. The Board may, of course, take this adjustment into account in explaining the rationality of its specific abatement formula on remand.